REBECCA J. BARRETT v. HENRY R. LOWREY,

AND

REBECCA J. BARRETT v. CHARLES H. FRAIN.

[2 Cases.]

*Equity—Fraudulent conveyances—Good-faith purchasers—Executions—Husband and wife.*

These cases involve the question of an alleged fraudulent sale of land to the complainant, upon which executions were levied by her husband's creditors, and she brings these suits to remove the cloud thereby created upon her title, and a decree dismissing said bills is affirmed by a majority of the Court. The cases involve questions of fact purely.

Appeal from Clinton. (Smith, J.) Argued June 28, 1889. Decided November 15, 1889.

Bill to remove cloud from title. Complainant appeals from decree dismissing bill. Affirmed. The facts are stated in the opinion.

*Fedewa & Lyon,* for complainant, contended:

1. Fraud must be clearly proven by such evidence as is required to establish any other fact, and cannot be lightly presumed; citing *Darling v. Hurst,* 39 Mich. 765; *Pogodzinski v. Kruger,*

44 Id. 79; *Campau v. Lafferty,* 50 Id. 114; *Brown v. Dean,* 52 Id. 267; and the law presumes honesty; citing *Hopson v. Payne,* 7 Mich. 334; and see, also, *Miller v. Beadle,* 65 Id. 643.

*Lyon & Hackleman,* for defendants, contended:

1. Evidence that complainant purchased amounts to nothing unless accompanied with clear and full proof that she paid for the farm with her separate funds; and in the absence of such proof the presumption is violent that her husband furnished the means of payment; citing *Keeny v. Good,* 21 Penn. St. 349; *Bradford's Appeal,* 29 Id. 515.

2. The transaction was really between James and his wife, and William was only a convenient tool; citing *Breslauer v. Geilfuss,* 65 Wis. 377; *Bank v. Tyler,* 55 Mich. 297.

3. Actual participation in the fraudulent intent by one who takes a transfer from an embarrassed debtor is not necessary. Good faith is affected by any facts which would put an ordinarily prudent person on inquiry; citing *Hough v. Dickinson,* 58 Mich. 89; *Bedford v. Penny,* Id. 424.

MORSE, J. The testimony in these two cases is the same, except as to the date of the levies of execution, and therefore I shall treat them both together.

In 1885, James Barrett, the present husband of complainant, was living upon and the owner of a farm in Clinton county. This farm was subject to a life-lease executed to an old gentleman, Charles White, who had in 1867 conveyed the premises to Barrett. Barrett was considerably in debt in 1885, and there were mortgages upon the land amounting to about $3,600,—one executed to a brother, William Barrett, for $1,200, January 7, 1885, which was assigned by William to Anna Barrett, January 10, 1885; one to Thomas C. Pitkin, of Detroit, for $600; and one to James M. Soverhill, of Geneva, New York, for $1,800. August 3, 1885, James Barrett conveyed this farm to his brother, William Barrett, the consideration in the deed being $6,000. August 10, 1885, the defendant Charles H. Frain, who had a judgment against James Barrett, levied upon the premises as the property of said

James Barrett, and the same were sold at sheriff's sale, and bid in by said Frain, and the usual certificate executed and filed in the proper office.

On December 19, 1885, the complainant married James Barrett. July 21, 1886, William Barrett conveyed the farm to the complainant, for the consideration, expressed in the deed, of $6,200, with a clause in the deed conveying also the wheat sown on the premises. September 24, 1886, the defendant Lowrey, who had a judgment against James Barrett, levied upon the premises as his property. No steps were afterwards taken to further enforce this levy. In the deed from James to William Barrett the premises were warranted free from all incumbrances. Nothing was said about incumbrances in the deed from William to the complainant.

In April or March, 1888, the complainant filed separate bills of complaint in the circuit court for the county of Clinton, in chancery, against Frain and Lowrey, alleging that she was the owner of the premises; that she had been in sole possession of the same since July 21, 1886; and that the value of the same was $5,000. She avers the levies, and the sale under the Frain execution, and the failure to further enforce them; that she had demanded their removal and cancellation of the defendants, notifying each of them that she was the legal and lawful owner, in fee, of the whole premises, but that they had each refused and neglected to comply with her demand, and that they each maintain that they have a legal lien upon the land, and that said James Barrett has an interest in the premises.

The defendants admit the levies, and their claim of lien under them, and aver that the deeds from James to William and from William to complainant were without consideration, in fraud of, and void against, James Barrett's creditors. The court below, upon the pleadings

and proofs taken in open court, dismissed both bills.

The decree in each case is manifestly right. The testimony shows a barefaced attempt on the part of James Barrett to defraud his creditors, and that William Barrett and complainant were parties to it, and that the deeds were made in execution of the fraud. At the time the deed from James to William was made, William was living with James, who was then a widower. They went to Lansing to have the deed, executed; and William, according to his testimony, had $3,000 in money, which at the time, and for some time before, he was carrying in his pocket. He did not pay James for the land at Lansing, when the deed was delivered, but waited until after they returned home, at night, when he paid James $2,400 in cash; that being the amount of the consideration over and above the mortgages. This payment rests on the oath of William alone; James not being sworn on behalf of complainant. No one has ever seen or heard of a dollar of this money since the pretended payment.

Where the money that William carried in his pocket came from is also a great mystery. He is not shown to have had it, except by his own testimony, which clearly shows he did not have it. He is a single man, and is now living where he was when this deed was executed, at the house of James Barrett. According to his testimony, he was in business 30 years in Franklin, Oakland county, where he had a varied experience; being arrested for various crimes and misdemeanors some 20 times, or more. He attributes his misfortunes in this respect to whisky, which he says he tried to destroy by drinking it for 15 years. Failing in this, he turned around, and attempted to prevent the sale of it. Then those who were in favor of liquor selling began to persecute him, procuring his arrest for various offenses, and also his conviction for some of them, larceny being one of the crimes of which

he was found guilty. He was in the dry-goods and grocery business at Franklin, and five years before the time he was testifying, owned a stock of goods inventoried at $5,000. He owned the store in which the goods were. He had no other property at that time, or when his store and goods were burned, about that time. He has done nothing to earn any money since, but has had plenty to live on. The insurance on the goods and store he has not yet collected.

He also testifies that at the time of the deed to him he knew of the mortgages on the land, but did not know that James owed any other debts. In almost the same breath, he swears that he does not know what James did with the money he paid him, but that James told him that he was going to work and pay up his debts with it, —little debts that he had around loose. He testifies that he bought the farm to get his pay upon the $1,200 mortgage he had upon it; but his own testimony shows that he had assigned the same to one Anna Barrett, his sister, over six months before, and received the money for it. After the execution of his deed, he still lived with James, and the farm was so managed and conducted by James that no one in the neighborhood knew or suspected that any transfer had been made to William.

October 30, 1885, James insured the house and barn on the premises against fire, and in his application for insurance stated that he owned the farm, and the buildings and personal property upon it. The deed from James to William was not put on record until July 21, 1886, the same day that William deeded to the complainant.

The statement of complainant in relation to the money she paid towards this land, and where she obtained it, is also very unsatisfactory. She claims to have paid William $1,000 the day the deed was executed to her, $800 of

which she borrowed of a relative, one Charles Haveland, who supports this claim by his testimony. Haveland is shown to have been at this time heavily in debt, with a large mortgage upon his farm, on which he was unable to pay the interest. The complainant's testimony was neither frank nor candid. On cross-examination she refused to answer many proper and reasonable questions. She was unwilling, and refused, to explain many things that needed explanation. In answer to different interrogatives, she said: "That is my own affair, mister," "I shan't answer," "I shan't tell, if I do know," and the like. If she could tell a plain, straightforward story as to her purchase of this land, she certainly did not do so on this hearing, or manifest any disposition to do so.

The payments she has made, since she received the deed of the farm, of interest on the mortgages and other debts have manifestly been made out of the proceeds of the farm, which she admits she has received, although to all outward appearances, James has run and managed it the same as he did before these conveyances were made. A very significant feature of these cases, as tried, is the failure of the complainant to call her husband, who is charged by the defense to have disposed of his land with intent to defraud his creditors. If the transaction was a fair and honest one, his testimony was material, and would have been of great advantage to complainant, and no good reason is shown for his remaining silent, as he was in the court-room during the trial, and testified, being called by the defense, as to some matters in the case.

It is suggested that the defendants have lost their right to enforce these levies because they have not moved sooner, and therefore the prayer of complainant's bill should be granted. It is said that one attacking a trans-

action as fraudulent must complain, by proper proceedings, promptly, or the remedy is waived. In the case of Frain, the levy was upon this land when the complainant pretends she purchased it, and was notice to her that fraud in the sale from James to William was complained of, and the levy of Lowrey was made very soon after she received her deed. The fraud was complained of speedily, and the initial steps taken to contest it. That is all the law requires. There has been no such delay since, in my opinion, as to waive or forfeit the rights of Frain and Lowrey to enforce their levies and prove the fraud complained of.

But, be this as it may, the complainant, coming into a court of equity, must show clean hands. When she comes in as she has here, and by her own testimony convinces the court that James Barrett made the conveyance to William to defraud his creditors, and that the subsequent deed from William to her was in furtherance of this fraud, she can hardly ask a court of chancery to relieve her against her fraud, and to judicially approve it, because Frain and Lowrey have not yet sought to enforce by further proceedings their claim of fraud against her. This will not do. By her own act, and out of her own mouth, she has established the fraud, and she must suffer the consequences of it.

The decree in both cases must be affirmed, with costs.

CHAMPLIN and LONG, JJ., concurred with MORSE, J.

SHERWOOD, C. J., (*dissenting in Barrett v. Lowrey*). The bill in this case is filed by the complainant to remove a cloud upon the title to her farm, lying in the township of Victor, in the county of Clinton, consisting of 160 acres, upon which she has her home, and now resides. The cloud consists of an execution levy made

upon the property on September 24, 1886, under the directions of the defendant, by virtue of a judgment rendered in the circuit court in favor of said Lowrey and against James Barrett, upon an indebtedness occurring in part in 1879 and in part in 1882 for the sum of $150.85 damages, and $23.75 costs of suit. James Barrett is the husband of complainant. The property in question is claimed to be worth, by the complainant, $5,000, and, by the defendant, "at least $7,000."

No question is made but at the time of making the levy the legal title to the property of record, as well as the possession thereof, was, and ever since has been, in the complainant. Charles White owned the land in 1867. He had no wife or family. In May of that year he conveyed the property to James Barrett, the present husband of the complainant, and subsequently took back a life-lease, signed by the grantee and his then wife. James went into possession under his deed, and Mr. White lived with him. James' first wife died previous to August, 1885, and complainant's first husband died in 1884, and she married James Barrett, December 19, 1885. On August 3, 1885, it would appear that James was owing some moneys besides the mortgages that were upon the farm, which mortgages then amounted to the sum of about $3,600, one of which was given to William Barrett, an unmarried brother of James, for the sum of $1,200; and, though he transferred it to his sister, Anna Barrett, he still appears to have looked after it in some way. James had become somewhat inebriated and reckless in his habits, and it would appear his debts were becoming due, and his creditors wanted their money; that his dissolute habits and imprudent conduct were subjecting him to the usual embarrassments in such cases.

In this crisis of his affairs, and while William, his brother, was stopping with him a few weeks, he sold the

property, subject to the mortgages, to William for about $2,400. This money, so far as appears, was paid in cash by William; and James avowed his purpose at the time to take it and pay his debts with it, and William says he advised James so to do. William allowed James to remain upon the property, and Mr. White with him, after making the purchase, and worked the farm under his employment; and it was during this period that complainant went into the employment of William at the house on the farm, and subsequently married James. At that time she was almost entirely unacquainted with James' financial condition and circumstances, but, on learning them afterwards, she discovered his embarrassments and his worthless habits, and that he was not managing the farming matters properly for William, who became dissatisfied with James' management also, and on or about July 21, 1886, William offered to allow her to purchase the farm, and save what she could from it, and William did on that day, and at her request, sell the property to complainant for $6,200, including the crops. This, with the property she then had, and by the aid her friends could give, she was enabled to do. The complainant made the purchase, after looking up the amount of the mortgages, and examining an old abstract which James had formerly procured of the property, and agreed to pay therefor the mortgages upon the same, amounting to $3,600. Of the balance, she paid in cash $1,000, and had succeeded in paying the remainder at the time of filing her bill, into two or three hundred dollars. She immediately went into possession, and took control of the farm and farming, and has ever since directed all farming operations thereon. The complainant states that she knew nothing of the indebtedness of her husband to the defendant, or of any levy upon the land in favor of defendant, when she made her purchase, but made the

same in good faith, and for a good and valuable consideration, and because she wanted the property, and invested all her property therein. William Barrett, from whom she purchased, also states that he knew nothing of the defendant's levy when he sold to complainant, and acted in good faith in selling to her, and that he knew nothing of defendant's alleged claim.

There is no question about the validity of the judgment of defendant against James, but the right to subject the complainant's property to its payment is denied by her, and she asks that the decree below to that effect may be reversed, and her property relieved from the cloud the levy casts upon it. It is the claim of defendant that the deed to complainant and the deed to William are both fraudulent and void, as against his judgment and levy, and should be so held, and he be allowed to come in and make his claim. The circuit judge held with the defendant.

I have not been able to take that view of the case, nor do I think the decree of the circuit judge ought to be sustained. Complainant received her deed, as well as William, before any levy was made, and complainant's possession was notice to all, not only as to her interest in the property, but of the extent thereof, even if her deed was unrecorded. The testimony relied upon to make out the fraud is very indefinite, and largely of a negative character, and the other, so far as it is competent and proper, is quite as consistent with the good faith and innocence of complainant as it is with the views urged by defendant; and, where such is the case, fraud cannot be held to be proved, nor will it be lightly presumed in any case. *Pogodzinski v. Kruger*, 44 Mich. 79 (6 N. W. Rep. 116); *Darling v. Hurst*, 39 Id. 765; *Campau v. Lafferty*, 50 Id. 114 (15 N. W. Rep. 40); *Brown v. Dean*, 52 Id. 267 (17 N. W. Rep. 837). No

fraudulent purpose is shown on part of complainant. *Brown v. Vandermeulen,* 44 Mich. 522 (7 N. W. Rep. 238); *Hopson v. Payne,* 7 Id. 334; *Miller v. Beadle,* 65 Id. 643 (36 N. W. Rep. 165).

The facts, I think, present the case of a wife who has in good faith and with honest purposes invested all the property she has, reaching about $1,500, in her efforts to secure and save something from the wrecked estate of a worthless, drunken husband, who, by his habits of intoxication and folly, has nearly dissipated the same.

It is very evident, from what appears in the record, James received all that his interest in the property was worth from William when he sold, aside from the mortgages, and there is not a particle of evidence showing, or tending to show, that the complainant ever had a dollar of that money, or in any way or manner attempted to divert its application to the payment and satisfaction of James' debts, but she several times, in giving her testimony, mentioned the fact of her paying some of his debts, even from her own means, and it very clearly appears that she is meeting her obligations satisfactorily to her creditors; that she is managing the property in a manner that would do credit to the most thrifty farmer in the township. This is disputed by no one, and is found fault with only by those who would deprive her of her property, even including her homestead, for the purpose of satisfying a debt she never contracted or assumed to pay, and that no rule of justice or equity will ever require her to pay. It is unnecessary to bring into this opinion the testimony in the case. It is enough to say that the conclusions I have reached are justified, in my judgment, by the undisputed testimony; and, when the other testimony is read, it will be found mostly of the negative sort, or argumentative,—put in the case, evidently, for the purpose of inducing conclusions prejudicial to complainant's

rights, but which, upon a careful examination, will lead any fair-minded man, I think, to a different result.

There is no question but that the claimed lien is a cloud upon complainant's title to her land, and should be removed.

I think the decree at the circuit should be reversed, and the record should be remanded, with instructions to the circuit judge to set aside the decree entered in the case, and enter a decree for complainant, in accordance with the prayer of the bill, and with costs of both courts.

SHERWOOD, C. J., (*dissenting in Barrett v. Frain*). The complainant brings suit against defendant to remove a cloud from the title to her land, lying in the town of Victor, in the county of Clinton, created by the levy upon and sale thereof under an execution, the levy being made before complainant purchased.

The case depends upon nearly the same state of facts as those in the case of *Barrett v. Lowrey, ante,* the only difference being that the judgment was rendered in favor of a different party, and originated in justice's court, and was subsequently removed into the circuit court by transcript, and upon which the execution issued and the levy was made before complainant made her purchase; and, there being no other essential difference, and the decree having been against the complainant, it should be set aside, and, upon the record being remanded, the circuit judge will enter a new decree in accordance with the prayer of the bill, and the complainant will be allowed to recover her costs of defendant in both courts.

CAMPBELL, J., (*dissenting*). I agree in the result arrived at by the Chief Justice. Such was my impression on the argument, and it has been confirmed by subsequent examination. It seems to me that the case of the

defendants has been made up out of a disregard of legal
rules, and an assumption that is not proved.    It is not
disputed that the legal title is in complainant, and that
it passed from James Barrett a long time ago.    Defend-
ants both claim whatever rights they have under levies
which could only be enforced by selling the property as
James Barrett's.    If they desired to attack the validity
of any transfers made by him, it could only be done by
filing bills in aid of their execution levies.    A sale under
execution not so aided would only pass such legal or
equitable title as he professed, and he had no such
title.

These defendants did not elect to proceed against the
holders of the title under James Barrett to have the trans-
fers declared fraudulent.    It is the well-settled rule in
regard to fraud that, unless complained of by proper pro-
ceedings, very promptly, the remedy is waived, and lost.
Fraudulent dealings are not void, but voidable; and delay
in attacking them would itself be fraudulent against third
persons, if it did not preclude redress.    If the title of com-
plainant can now be attacked, the defendants would reap
the advantage of all of her outlays for taxes, and in
reduction of the mortgages and other expenditures which
they would have been compelled to look after if they had
proceeded promptly, and succeeded in their action.    It is
the right of the legal owner to have clouds cleared off,
and a person who pretends to have a claim to avoid that
title, which may be waived, and will not enforce it, is
entitled to no regard.

But I do not think fraud appears.    Complainant is
shown, beyond question, I think, to be a purchaser in
good faith; and if so she cannot be disturbed in her title.
But I cannot find any satisfactory reason for believing
that James Barrett conveyed with any fraudulent pur-
pose.    He has fallen into bad habits, but it appears affirm-

atively that he had, within a short period before the sale, been able to borrow between three and four thousand dollars on investment mortgages, which are always made in reliance of prompt payment of interest, and which were made by men known to be sagacious and careful. It is not shown that any bad use was made of that money, neither does it appear that James Barrett was concealing property, or scheming against his creditors, or that he had any strong motive for fraud. It is only by assuming that several persons, without any apparent reason, combined to cover up this man's property, to cut off a couple of small claims, less than the annual outlay necessary for interest and taxes, that any case for defendants can be made out. It seems to me to be straining probabilities, and assuming very unusual conduct, for no adequate reason, to find any fraud at all. I think complainant had a right to complain of the dog in the manger policy of defendants, and should have relief.